UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-09785-SVW-AJR | Date | November 12, 2025 |
| Title | *Altamirano Ramos v. Lyons et al* | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |
| Daniel Tamayo | N/A |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** ORDER DENYING PETITIONER'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER [3]

## I. Introduction

Before the Court is an ex parte application for a temporary restraining order ("TRO"), filed by Petitioner Isaul Altamirano Ramos ("Altamirano Ramos"). ECF No. 3. Respondents Todd Lyons, et. al. oppose the TRO on jurisdictional and substantive grounds. ECF No. 4. For the following reasons, the application is DENIED.

## II. Background

Petitioner Altamirano Ramos, a citizen and native of Mexico, entered the United States without inspection on September 1, 1999. ECF No. 3 Ex. B ("I-213") at 2. For over twenty-five years since that date, Ramos has been a resident of Los Angeles, California, where he has three children—all United States citizens—aged 17, 15, and 7. ECF No. 3 at 2. Moreover, Altamirano Ramos has no criminal record. I-213 at 2.

On June 12, 2025, Petitioner "was encountered" by immigration enforcement officials at a shopping center in Buena Park, California, where Petitioner was removed from his vehicle and detained for refusing to talk to the officials. Id. Petitioner was then transported to the Adelanto Detention facility, where he remains, pending removal proceedings. Id.; ECF No. 3 at 2. Petitioner was granted a bond hearing, which was held before an immigration judge ("IJ") on August 7, 2025. Id. However, the IJ did not reach the merits on the issue of bond, finding a lack of jurisdiction because Petitioner was supposedly detained under the mandatory detention provision of 8 U.S.C § 1225(b)(2). Id.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-09785-SVW-AJR | Date | November 12, 2025 |
| Title | *Altamirano Ramos v. Lyons et al* | | |

On October 13, 2025, Altamirano Ramos filed the present Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241. ECF No. 1. In simple terms, Petitioner claims:

1. The IJ's refusal to reach the merits on the matter of Petitioner's eligibility for release on bond was unlawful under 8 U.S.C § 1226(a). ECF No. 1 ¶ 13.
2. Petitioner's detention is unconstitutional because Petitioner was arrested and detained without probable cause, in violation of the Fourth Amendment. Id.
3. Respondents are depriving Petitioner of Fifth Amendment "due process" protections by classifying Petitioner as a detainee under 8 U.S.C § 1225(b)(2)(a), thereby categorically denying him access to a hearing to determine on the merits his bond eligibility. Id.

In light of these alleged violations, Petitioner requests the following relief from the Court: an order to immediately release Petitioner from custody, alongside an order preventing re-detention without an individualized bond hearing; in the alternative, an order requiring the immigration judge to hold a bond hearing on the merits, pursuant to 8 U.S.C. § 1226.

On October 14, 2025, Altamirano Ramos filed an ex parte application for a TRO, requesting that the Court enjoin Respondents from continuing to detain Altamirano Ramos unless a bond hearing on the merits before an IJ is provided within seven days. ECF No. 3 at 2. On October 15, 2025, Respondents filed an opposition to the ex parte application, arguing: (1) the Court lacks jurisdiction over this action, and (2) Petitioner has not satisfied the demanding standard necessary to obtain injunctive relief. ECF No. 4 at 5-14. On October 16, 2025, Petitioner filed a reply. ECF No. 7.

## III. Legal Standard

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "A [petitioner] seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* These same elements apply to Petitioner's TRO. *West v. PBC Mgmt. LLC*, No. 23-cv-03283-BLF, 2023 U.S. Dist. LEXIS 118204, 2023 WL 4477296, at *2 (N.D. Cal. July 10, 2023) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) ("The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.").

"[I]f a [petitioner] can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the

:

Initials of Preparer DTA

'balance of hardships tips *sharply* in the [petitioner's] favor,' and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

Importantly, a temporary restraining "is an extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Indeed, the moving party bears the burden of meeting all prongs of the *Winter* test. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011) ("To warrant a preliminary injunction [or TRO], [the petitioner] must demonstrate that it meets all four of the elements of the preliminary injunction test established in *Winter*[.]"). The decision of whether to grant or deny a temporary restraining order is a matter of the district court's equitable discretion. *See Winter*, 555 U.S. at 32.

## IV. The Jurisdictional Question

Respondents argue that the Court is jurisdictionally barred from reviewing Petitioner's claims in this action under 8 U.S.C. § 1252(g) and § 1252(b)(9). Respondents' arguments are unavailing.

Habeas relief extends to those who can show they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Although Congress has barred courts from reviewing certain discretionary decisions concerning detention or release of noncitizens subject to removal proceedings, (*see* 8 U.S.C. §§ 1226(e), 1252(g)), federal courts retain jurisdiction to "review related 'constitutional claims or questions of law.'" *Martinez v. Clark*, 36 F.4th 1219, 1224 (9th Cir. 2022) (quoting Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011)), vacated on other grounds by 144 S. Ct. 1339 (2024). A habeas petition filed by someone in immigration custody seeking an individualized bond hearing "falls within the 'core of habeas.'" *Doe v. Garland*, 109 F.4th 1188, 1194 (9th Cir. 2024).

8 U.S.C. § 1252(g), in pertinent part, provides: "except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

Although, at first blush, the phrase "arising from" appears to cover a broad array of decisions in removal proceedings, the Supreme Court has been unequivocal in its clarification that the range of challenges anticipated by the provision is actually "narrow." *See, e.g., Dep't of Homeland Sec. v. Regents Univ. of Calif.,* 591 U.S. 1, 19 (2020). As far back as 1999, in *Reno v. American-Arab Discrimination*

*Comm.*, the Court found it "implausible" to interpret this provision so that the "mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." 525 U.S. 471, 482 (1999) (holding that § 1252(g) applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." (Emphasis in original)). This finding was reinforced in *Jennings v. Rodriguez*. 583 U.S. 281, 294 (2018) ("we did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves.") (citing *Reno*, 525 U.S. at 482-83). The Ninth Circuit has recently reinforced this holding as well. *Ibarra-Perez v. United States*., __ F.4th __, 2025 WL 2461663, *7 (9th Cir. 2025) (quoting *Jennings*, 583 U.S. at 294). Here, much like in *Jennings*, Petitioner's challenges denial of a bond hearing on the merits, not actions of Respondents in commencing removal proceedings, adjudicating cases, or executing removal orders. Therefore, § 1252(g) is not a jurisdictional bar.

Nor, for that matter, are 8 U.S.C. § 1252(a)(5) and § 1252(b)(9), which state, respectively and in pertinent part, "a petition for review filed with an appropriate court of appeals … shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter," and "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States…shall be available only in judicial review of a final order."

Defining the purpose and scope of these provisions is unnecessary here. For our purposes, it is enough to say that it is well established that the jurisdiction-channeling provisions, 8 U.S.C. § 1252(a)(5) and § 1252(b)(9), "do[] not bar claims that are 'independent of or collateral to the removal process," such as Petitioner's claim before this Court. *Ibarra-Perez*, 2025 WL 2461663 at * 9 (quoting *J.E.F.M v. Lynch,* 837 F.3d 1026, 1032 (9th Cir. 2016). The Supreme Court in recent years has twice addressed essentially this exact question, when faced with lawsuits where, as here, noncitizens were challenging mandatory detention. *Jennings v. Rodriguez*, 583 U.S. 281 (2018); *Nielsen v. Preap*, 586 U.S. 392, (2019). In both cases, our highest Court found no jurisdictional bar. *See Nielson*, 586 U.S. at 402 ("nor are we stripped of jurisdiction by § 1252(b)(9) [because] respondents here are not asking for review of an order for removal [as opposed to the decision to deny them bond hearings]; and they are not even challenging any part of the process by which their removability will be determined.") (quoting *Jennings*, 583 U.S. at 294).

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-09785-SVW-AJR | Date | November 12, 2025 |
| Title | *Altamirano Ramos v. Lyons et al* | | |

Finally, the Court does not need to wait until Petitioner has appealed the IJ's decision to the BIA before exercising jurisdiction. True, a habeas petitioner seeking relief under 28 U.S.C. § 2241 generally must first exhaust all available administrative remedies. *See Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012). But because the exhaustion requirement is not jurisdictional, it is subject to waiver. *Id*. at 1045-46; *Arango Marquez v. INS*, 346 F.3d 892, 897 (9th Cir. 2003) ("[T]he district court properly waived exhaustion, because the exhaustion requirement in § 2241 cases is prudential, rather than jurisdictional."). In *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007), the Ninth Circuit explained that prudential exhaustion may be required when three factors are present: (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

First, agency consideration is not necessary to generate a record or reach a proper decision in this matter. While this Court defers to the agency's expertise as to the substantive, fact-based decision of granting or denying bond, this present question of statutory and constitutional interpretation does not require an appellate record developed by the BIA. *See Hernandez v. Sessions*, 872 F. 3d 976, 989 ("an administrative appellate record is not necessary to resolve ... purely legal questions"); *see also Loper Bright Enters. v. Raimondo,* 603 U.S. 369 (2024) (holding that the task of resolving statutory interpretation belongs to the independent judgment of the courts). Relaxation of the exhaustion requirement would also not encourage the deliberate bypass of the administrative scheme. In fact, this Court is persuaded by the argument made by other courts addressing this issue that resolving this underlying legal uncertainty will provide definitive guidance for future administrative proceedings, likely *decreasing* the number of future habeas petitions, thereby *reducing* bypass of the administrative scheme. *See Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1252. Finally, appellate review by the BIA would not likely lead to self-correction. As discussed, *supra*, the present DHS policy guidelines and precedential BIA opinion in the *Matter of Jonathan Javier Yajure Hurtado* make the result of an administrative appeal all but certain and therefore unnecessary. *See* Hernandez, 872 F. 3d at 989 ("where the agency's position on the question at issue appears already set, and it is 'very likely' what the result of recourse to administrative remedies would be, such recourse would be futile and is not required.") (citing *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1991).

Considering that the Court has habeas jurisdiction over this matter, there is no statutory bar, and waiver of the prudential exhaustion requirement is appropriate, this Court's exercise of jurisdiction is proper.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:25-cv-09785-SVW-AJR | Date | November 12, 2025 |
|---|---|---|---|
| Title | *Altamirano Ramos v. Lyons et al* | | |

**V. Likelihood of Success on the Merits**

Respondents argue that Petitioner is properly classified as a detainee under § 1225(b)(2)(a), and that Petitioner is not eligible for a bond hearing under § 1226(a), and therefore no due process violation occurred. The Court agrees.

At the outset, the court acknowledges that, in a recent order in a different case, the court rejected Respondent's interpretation. *See Emma Marcela Crespin De Paz v. Kristi Noem et al.*, 2:25-cv-06649-SVW-JPR, ECF No. 16. However, in that order, the court also noted "the complexity of the statutory interpretation question" and the court's "ambivalence as to its resolution." *Id.* at 3, 7. And after additional research and analysis, the court has concluded that Petitioner is subject to mandatory detention under § 1225(b)(2)(a), and that Petitioner is not eligible for a bond hearing under 8 U.S.C. § 1226(a).

***First***, under section 1225(b)(2)(A), Petitioner is an "applicant for admission," who is subject to mandatory detention.

The statute defines that term as "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . whether or not at a designated port of arrival." 8 U.S.C. § 1225(a)(1). Thus, the statute identifies two categories of aliens: (1) those "present in the United States who ha[ve] not been admitted"; and (2) those "who arrive[] in the United States . . . whether or not at a designated port of arrival." *Id.* The statute expressly treats a person in *either* category as an "applicant for admission." *Id.*; *see also Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 743 (BIA 2012) ("Congress has defined the concept of an 'applicant for admission' in an unconventional sense, to include not just those who are expressly seeking permission to enter, but also those who are present in this country without having formally requested or received such permission").

Other portions of the statute reinforce those two categories. Specifically, the statute describes different inspection procedures for (1) "aliens arriving in the United States," 8 U.S.C. § 1225(b)(1); and (2) "other aliens," including any other "applicant for admission," 8 U.S.C. § 1225(b)(2), (b)(2)(A); *see also Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018) (explaining that § 1225(b)(2) "serves as a catchall provision that applies to most applicants for admission not covered by § 1225(b)(1)").

Finally, the statute does not limit the applicability of that first category (i.e., an alien present in the United States who has not been admitted) to aliens who have been present in the United States for only some limited period of time, or aliens who were apprehended in the United States within a certain distance

:

Initials of Preparer DTA

from the border. Instead, the statute applies broadly to all aliens who are "present in the United States who ha[ve] not been admitted." 8 U.S.C. § 1225(b)(a)(1).

That is consistent with Congress's intent: eliminating "an anomaly whereby immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully," and "ensur[ing] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA—in the position of an 'applicant for admission.'" *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020).

Petitioner is therefore subject to § 1225(b)(2)(a), which requires mandatory detention of an "applicant for admission" if "the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted . . . " Those requirements are satisfied here.

Petitioner is "seeking admission" because the statute treats an alien who is "an applicant for admission" as someone who is, legally speaking, "seeking admission." For example, the statute notes that all aliens "who are applicants for admission *or otherwise seeking admission* . . . shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). The use of the phrase "or otherwise" suggests that "seeking admission" is an appositive, *i.e.*, "a word or phrase that is synonymous with what precedes it," *United States v. Woods*, 571 U.S. 31, 45 (2013).

That is consistent with the statute's use of the phrase "applicant for admission" not as referring to an individual who literally has submitted an application for admission, but instead "as a term of art denoting a particular legal status," *Torres*, 976 F.3d at 927, that status being one of the two categories of aliens described above. Courts have therefore treated an "applicant for admission" as one who is, under the law, "seeking admission." *See also Jimenez-Rodriguez v.Garland*, 996 F.3d 190, 194 n.2 (4th Cir. 2021) (noting that the petitioner was an "applicant for admission" and that, "[b]ecause [petitioner] was never lawfully admitted, he qualifies as someone 'seeking admission'"); *Succar v. Ashcroft*, 394 F.3d 8, 13 (1st Cir. 2005) (treating, based on statute, "aliens who are present in the United States, but who have not been inspected and admitted," as "aliens who are seeking admission"); *Lemus-Losa*, 25 I. & N. Dec. at 743 ("[M]any people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws").

Finally, the "examining immigration officer" here—i.e., the immigration enforcement officers who detained Petitioner—"determine[d] that [Petitioner] is not clearly and beyond a doubt entitled to be

:

Initials of Preparer DTA

admitted." 8 U.S.C. § 1225(b)(2)(A); *see also* 8 U.S.C. § 1101 (defining "immigration officer" broadly as "any employee or class of employees of the [Immigration and Naturalization Service] or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title"). Accordingly, Petitioner is subject to the mandatory detention requirement of 8 U.S.C. § 1225(b)(2)(A).

***Second***, § 1226(a) plainly does not apply to Petitioner's detention. Pursuant to the express language of the statute, *see* 8 U.S.C. § 1226(a), the Supreme Court has repeatedly explained that the statute "authorizes detention only '[o]n a warrant issued' by the Attorney General leading to the alien's arrest," *Jennings*, 583 U.S. at 302; *see also Nielsen v. Preap* (2019) 586 U.S. 392, 410 (explaining that "the need for a warrant" is one of the "procedural requirements" of detention under § 1226). The statute refers to the warrant mechanism not once, but twice. *See* 8 U.S.C. § 1226(a) (noting that the Attorney General may revoke bond and "rearrest the alien under the original warrant").[1]

The Supreme Court's explanation of the process for a warrant-based apprehension and detention under § 1226(a) confirms that the warrant must be issued *before* the alien is arrested and taken into custody. *See Arizona v. United States*, 567 U.S. 387, 407 (2012). *Arizona* explains that "the Attorney General can exercise discretion to issue a warrant" for arrest and detention of an alien under § 1226(a). *Id.* If that happens, the warrant is "executed by federal officers who have received training in the enforcement of immigration law." *Id.* at 408. By contrast, "[i]f no federal warrant has been issued, those officers have more limited authority," and can arrest an alien only as authorized under 8 U.S.C. § 1357, a statute which permits warrantless arrests. *See id.*; *see also* 8 U.S.C. § 1357(a)(2).

Here, Petitioner was not arrested pursuant to a warrant. For example, the Secretary did not issue a warrant targeting Petitioner that federal officers then executed, resulting in Petitioner's arrest. *See Arizona*, 567 U.S. at 408. Instead, Petitioner was "encountered" by immigration officers, arrested without a warrant, and taken into custody. ECF No. 3-1 at 9–10. Although the I-213 report indicates that an administrative warrant and notice to appear was later issued during Petitioner's processing, that administrative warrant was necessarily issued *after* Petitioner was arrested and taken into custody. It therefore cannot be a warrant "*leading to* the alien's arrest." *Jennings*, 586 U.S. at 410 (emphasis added); *see also* see also *Arizona*, 567 U.S. at 407 (explaining that a notice to appear "does not authorize an arrest"); *Florida v. United States*, 660 F.Supp.3d 1239, 1277 (N.D. Fla. 2023) (finding placement of

[1] The references to "Attorney General" in the statute are understood to refer to the Secretary of Homeland Security, as the Attorney General's authority has been transferred to the Secretary. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

:

Initials of Preparer DTA

administrative warrant and notice to appear in file after initial arrest and detention does not satisfy § 1226(a) because, "by the time DHS puts the 'administrative warrant' in the alien's file . . . the alien has already been arrested").

Accordingly, the court finds that Petitioner is subject to the mandatory detention provision of § 1225(b)(2)(A), and § 1226 does not apply.

Many courts addressing these two statutes have expressed concerns about surplusage flowing from potential overlap between § 1225(b)(2)(A) and § 1226. The overlap is as follows: § 1225(b)(2)(A) applies only to an "applicant for admission," *i.e.*, an alien who has not been lawfully admitted to the country. By contrast, § 1226 has no limiting language. It conceivably applies to all aliens—i.e., aliens who were never lawfully admitted *and* aliens who had lawful status but are now "believed to be subject to removal," *Nielsen*, 586 U.S. at 396, either because they overstayed their visa, committed a qualifying criminal offense, or otherwise, *see, e.g.*, *Jennings*, 583 U.S. at 289–290 (applying § 1226 to lawful permanent resident convicted of drug offense and vehicle theft).

The court concludes that, if anything, that overlap counsels towards applying § 1225(b)(2)(A) to Petitioner. That is because of the "commonplace" principle of statutory interpretation that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). "That is particularly true where," as here, "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (explaining that the Immigration and Nationality Act "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country'").

Courts have applied that canon of construction in immigration cases. *See, e.g.*, *Nadarajah v. Gonzales*, 443 F.3d 1069, 1079 (9th Cir. 2006) ("Given that Congress has placed specific limits on the Attorney General's authority to detain suspected terrorists, those statutory provisions must govern such detentions, instead of the general detention provisions that apply to all aliens coming into the United States.") And "the canon has full application as well to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX*, 566 U.S. at 645.

:

Initials of Preparer DTA

Here, while § 1226 applies generally to *all* aliens, § 1225(b)(2)(A) applies specifically to an "applicant for admission"—i.e., an alien who is physically present in the United States but has not been lawfully admitted. That is precisely the position that Petitioner is in. The specific provision § 1225(b)(2)(A) therefore governs. *See id.* That is especially true where the warrant requirement of § 1226 has not been satisfied.

Finally, the court's interpretation is consistent with the longstanding "entry fiction" doctrine. Under that doctrine, an alien who is physically present but has not been lawfully admitted into the country is "legally considered to be detained at the border and hence as never having effected entry into this country." *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1097 (9th Cir. 2004). "[T]hough she currently stands on United States soil," *id.*, she is "still in theory of law at the boundary line and ha[s] gained no foothold in the United States," *Kaplan v. Tod*, 267 U.S. 228, 230 (1925).

The entry fiction doctrine flows from the principle that the "power to admit or exclude aliens is a sovereign prerogative," and "the Constitution gives the political department of the government plenary authority to decide which aliens to admit." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quotations omitted). That includes the "power to set the procedures to be followed in determining whether an alien should be admitted." *Id.*

The entry fiction doctrine protects that sovereign prerogative, which "would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil." *Id.* Thus, as *Thuraissigiam* explains, "[w]hen an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country." *Id.* That is true even if the alien is "paroled elsewhere in the country *for years* pending removal." *Id.* (emphasis added). Those aliens are treated "as if stopped at the border." *Id.* (quotations omitted). *Thuraissigiam* held that "[t]he same must be true" of an "applicant for admission" who enters the country unlawfully. *Id.* at 140.

While *Thuraissigiam* applied that reasoning to an alien who was detained 25 yards from the border shortly after unlawfully entering the country, *see id.* at 114, the same must be true of *any* alien who enters unlawfully, regardless of how far they make it into the country, or how long they remain undetected. That is consistent with *Thuraissigiam*'s observation that even an alien who arrives at the border and then is "paroled elsewhere *for years* pending removal" is legally treated as if they are "stopped at the border." *Id.* at 139 (emphasis added).

:

Initials of Preparer DTA

A contrary rule creates difficult and improper line drawing exercises for courts and is inconsistent with the entry fiction doctrine. For example, if § 1225(a) is interpreted as applying only to aliens at the border (despite no support in the text for that limitation), then where does the statute's application end? One mile from the border? Twenty-five miles? And how quickly must the alien be apprehended before the statute no longer applies? Within one hour? One day? One week? The statute does not address those difficult questions (because it is not temporally or geographically limited and instead applies to *any* alien who is "present in the United States who has not been admitted," 8 U.S.C. § 1225(a)(1)).

But those questions are not only difficult; they are also not for the courts to answer. Instead, they are questions "for the political department of the government," which has "plenary authority to decide which aliens to admit" and the "procedures to be followed" in that admission. *Thuraissigiam*, 591 U.S. at 139 (quotations omitted); see also *id.* at 140 (rejecting the rule that alien has entered the country simply because he has set foot on U.S. soil, because the rule "would undermine 'the sovereign prerogative' of governing admission to this country").

Here, the political department has exercised its sovereign prerogative. It decided that any alien who is "present in the United States [but] has not been admitted" is considered an "applicant for admission." 8 U.S.C. § 1225(a)(1). Indeed, the legislative history of § 1225(a)(1) suggests that Congress's definition of "applicant for admission" incorporates the entry fiction doctrine. *See* H.R. Rep. No. 104-469, pt. 1, at 226 (explaining that "aliens who have entered without inspection . . . will not be considered to have been admitted").

Finally, construing the statute in the manner that Petitioner suggests creates a "perverse incentive to enter at an unlawful rather than a lawful location." *Id.* at 140. As explained above, Congress's enactment of § 1225(a)(1) "ensures that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA—in the position of an 'applicant for admission.'" *Torres*, 976 F.3d at 928. Interpreting the relevant statutes in a manner that provides a more favorable procedure to aliens who entered the country unlawfully and remained undetected would incentivize unlawful entry and evasion, thereby undermining Congressional intent. *See also* H.R. Rep. 104-469, pt. 1, at 225 (legislative history explaining that definition of "applicant for admission" was intended to correct system "under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry").

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-09785-SVW-AJR | Date | November 12, 2025 |
| Title | *Altamirano Ramos v. Lyons et al* | | |

Accordingly, the court joins those district courts that have ruled that § 1225(b)(2)(A) applies to an alien who is physically present in the United States but not lawfully admitted, regardless of how long they have been physically present here. *See Sandoval v Acuna et al.*, 2025 WL 3048926, at *4 (W.D. La. Oct. 31, 2025) (W.D. La., Oct. 31, 2025); *Chavez v. Noem*, 2025 WL 2730228 (S.D. Cal. Sept. 24, 2025); *Pena v. Hyde*, 2025 WL 2108913, (D. Mass. July 28, 2025); *Vargas Lopez v. Trump*, 2025 WL 2780351 (D. Neb. Sept. 30, 3025).

Finally, because Petitioner cannot establish a statutory right to a bond hearing, the failure to provide a bond hearing does not constitute a violation of due process. *See Thuraissigiam*, 591 U.S. at 138–140 (explaining that an alien who has never been lawfully admitted to the United States is "'treated' for due process purposes 'as if stopped at the border," "has only those rights regarding admission that Congress has provided by statute," and that "the Due Process Clause provides nothing more"); *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings"); *cf. United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border.").

Because Petitioner has not shown a likelihood of success or serious question on the merits, the court need not address the remaining *Winter* factors.

## VI. Conclusion

For the foregoing reasons, Petitioner's ex parte application for a temporary restraining order is DENIED.

**IT IS SO ORDERED.**

:

Initials of Preparer DTA